THE HONORABLE FRANKLIN D. BURGESS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DARLENE CHERRY, | ) Case No. C060-5452 FDB |
| | ) |
| | ) **IN ADMIRALTY** |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **FINDINGS OF FACT AND** |
| | ) **CONCLUSIONS OF LAW** |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

This case having come on for a trial without a jury, and the Court having heard and reviewed the testimony of the witnesses, live and by deposition, and having duly considered the evidence of record, the credibility of the witnesses, the entire file of the Court, and the contentions and arguments of counsel, the Court herewith makes its findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, as follow:

## **FINDINGS OF FACT**

The SS CAPE INTREPID is a vessel owned by the United States and operated by Crowley Liner Services.

The SS CAPE INTREPID deployed in September or October 2004. At that time, the Steward's Department consisted of plaintiff as Chief Steward, a Chief Cook, Bill Bryley, and a Steward's Assistant, Abdulaziz Saleh.

Plaintiff Cherry testified that she fell on the SS CAPE INTREPID as she was putting eggs in the refrigerator at about 10:00 a.m. November 29, 2004.

Chief Cook Bryley recalls hearing a shriek and a thump when he was working in the galley. He went out to see what happened and saw the General Vessel Assistant (GVA) Abdulaziz Saleh helping Plaintiff Cherry up.

GVA Saleh recalled in his statement (which, because of his trouble with the English language, he asked the Ship's Chairman, Ben Born, to write for him) [Ex. A-2]: that he was in the pantry washing dishes when Plaintiff passed behind him. He heard her fall, and she was on the floor when he turned around. Saleh said that the Chief Cook came out of the galley and they picked her up. He recalled that the Chief Cook asked her whether she was all right, and she said she was all right and walked away. Saleh said, "There was a small amount of water on the floor. I had done everything she told me to do to prevent water on deck. I had the 'Wet Floor' sign out by the officer mess door in Pantry. I also had a mop preventing most of water getting on the floor."

Later that same day of the fall, GVA Saleh recalled in his statement [Ex. A-2]: "I was walking back into pantry later that day and saw the stewart [sic] starting and stoping [sic] the dish washer. She was letting it run until water would over flow then raise the doors and start it again. She did this several times. I asked her what she was doing. She said sssh. Gosh Sally Don't say anything to anyone. She then started to take pitures [sic]."

Plaintiff did not report the alleged incident in the galley until February 17, 2005, nearly three months after the claimed injury. (Plaintiff's Exhibit 3.)

Plaintiff did not seek medical treatment for the alleged incident from the medical officer onboard the SS CAPE INTREPID between the date of the November 29, 2004 purported incident and plaintiff's report of same on February 17, 2005, as evidenced by the ship's official Medical Log. (United States' Exhibit A-4, Plaintiff's Exhibit 3.)

By contrast, Plaintiff did in fact seek medical attention in the ship's infirmary

Findings and Conclusions        2

1  for a cut finger on December 17, 2004, yet failed at that time, or any other, to make any
2  report or claim regarding an injury or related pain regarding her lower back or right leg.
3  (United States' Exhibit A-4.)

4  The SS CAPE INTREPID had been in port at Diego Garcia from on or about
5  January 8, 2005 to February 17, 2005. Medical facilities were at all times available in Diego
6  Garcia had plaintiff chosen to avail herself of them. (United States' Exhibit A-11, 18:10-11.)

7  During the foregoing five-plus weeks that the vessel was in Diego Garcia,
8  plaintiff went ashore for personal and recreational reasons, yet never sought medical
9  treatment of any kind until February 17, 2005 .

10  During the period between the time of the alleged fall, November 29, 2004,
11  and the time she left the vessel, February 17, 2005, Ms. Cherry was seen running up stairs
12  on the ship with a box of cigars under her arm, climbing a Jacob's ladder with a backpack on,
13  and leaping from the gangway to a rolling launch. (United States' Exhibits A-1 and A-11,
14  20:19 - 22:14.)

15  Plaintiff never once after November 29, 2004 advised her coworker, Chief Cook
16  William Bryley, that her back hurt. and she continued to perform all of her duties with no
17  difficulty up until February 17, 2005. (United States' Exhibit A-12, 15:1-9.)

18  The first time plaintiff sought medical treatment related to the alleged
19  November 29, 2004 incident was on February 17, 2005, the last day the vessel was in Diego
20  Garcia. (Plaintiff's Exhibits 3 and 6.)

21  Upon going ashore to the medical clinic at Diego Garcia, the person who saw
22  plaintiff first declared her "fit for duty - no restrictions", then for some reason lined that out
23  and declared her "not fit for duty/fit for travel." No diagnostic studies, including X-Rays,
24  were performed and, conversely, the "diagnosis" was based solely upon Ms. Cherry's
25  subjective complaints of pain arising from the alleged incident nearly three months
26  previously. (Plaintiff's Exhibit 6.)

27

28  Findings and Conclusions        3

1  Prior to leaving the vessel on February 17, 2005 to go to the medical facility in
2  Diego Garcia, plaintiff had already packed up her belongings aboard the ship. (United
3  States' Exhibit A-11, 23:9-20.)

4  The SS CAPE INTREPID left Diego Garcia on February 17, 2005.

5  Plaintiff returned to Seattle on February 19, 2005, after being in transit for
6  three days. Upon her arrival at the SeaTac Airport, plaintiff was wearing a backpack and had
7  no apparent difficulty lifting suitcases off the luggage carousal at baggage claim. (United
8  States' Exhibit 9, videotape of plaintiff.)

9  Plaintiff's stateside treating physician certified that plaintiff was fit to return
10 to sea duty as a Steward on May 25, 2005. (Plaintiff's Exhibits 7.)

11 Plaintiff herself certified that she was fit to return to sea duty as a Steward on
12 May 25, 2005. (Plaintiff's Exhibits 7.)

13 The Court has also had the opportunity to view recently videotaped evidence
14 of plaintiff, including a September 5, 2007, video of plaintiff, while wearing high-heeled
15 shoes, lifting a large briefcase into the trunk of her Mercedes auto with no difficulty. (United
16 States Exhibit A-9.)

17 Despite her fit -for-duty status, plaintiff never sought work again as a merchant
18 seaman and instead began working as a real estate agent. In 2006, Ms. Cherry grossed
19 $118,220 as a real estate agent. This is more than Ms. Cherry ever earned in a single year
20 as a merchant marine. (Plaintiff's Exhibit 12B.)

21 At trial, plaintiff did not provide or seek to provide expert testimony through
22 an economist or otherwise concerning claims for alleged loss of wages or other potential
23 damage components, such as pension and health and welfare benefits. Instead, plaintiff
24 attempted to provide testimony regarding such claims through her own testimony, claiming
25 that she suffered such losses as a result of the alleged injury of November 29, 2004.

26 Plaintiff's treating physician did not testify as a witness at trial.

28 Findings and Conclusions        4

1    Plaintiff did not disclose or designate any expert medical (or other expert)
2 witnesses pursuant to the requirements of Rule 26 of the Fed.R.Civ.P., including any
3 designation or disclosure of plaintiff's treating physician as an expert witness regarding
4 causation issues.

5    Upon consideration of the briefs and arguments, the Court found that the issue of
6 causation in this case required expert medical testimony. *Strok v. F/T Northern Jager*, 1992
7 WL 503590 (W.D. Wash. 1992), 1993 A.M.C. 1290.

8    The Court further determined that a treating physician, such as plaintiff's
9 treating physician, Dr. Moravek, could not provide expert testimony on an issue that calls
10 for expert opinion unless the treating physician was disclosed as an expert pursuant to Fed.R.
11 Civ.P. 26(a)(2)(A). As stated earlier, plaintiff's treating physician was not so disclosed.

12    Dr. James F. Green, M.D., an orthopedic surgeon, Defendant's expert,
13 examined Plaintiff and reported his diagnosis in his June 26, 2007 report as follows:

> No objective cause for the patient's ongoing complaints has been identified. The electrodiagnostic testing does not confirm right lower extremity radiculitis or radiculopathy. The imaging abnormalities do not show a cause for the ongoing symptoms. Imaging studies have revealed early lumbar degenerative disc disease without herniation. The degenerative process which is evident is consistent with her age. The location of the degenerative process does not correlate with her subjective complaints.
> On an objective basis, Ms. Cherry was fit for duty on both April 12, 2005 and May 25, 2005.
> On an objective basis, she is currently fit for duty. There is no objective cause to limit her participation in a full range of activities as she desires.

20    At his deposition, when Dr. Green was asked to explain the findings shown by the
21 MRI, he stated: "It shows some mild degenerative changes in her back without any
22 compromise of the – what's called the neurocanal, where the nerves are, and so there wasn't
23 any reason to believe that the nerves were being impinged or impaired in the neurocanal."
24 [Green Dep. p. 12]   When Dr. Green was asked whether there was any relation to those
25 degenerative changes and the slip and fall of November 2004, Dr. Green replied: "The
26 findings are degenerative in nature, and there's nothing outstanding about them that would

28  Findings and Conclusions          5

1 relate to that specific incident. *Id.*

2 Dr. Green was asked about the difference between the March 2005 MRI and the
3 August 13, 2007 MRI, and he responded as follows:

> What they are describing her in this MRI are degenerative changes, which means that the wear and tear changes which were seen on the first one are simply described as either better or have progressed. And in addition, they're finding a cyst which has formed on the left side at the L4-5 facet.

When Dr. Green was asked whether, in his opinion, there is a link between the slip and fall in 2004 and these findings, he responded: "No." *Id.* at 20.

Dr. Green was then questioned about the latest report from Dr. Moravek of September 17, 2007, and he indicated that there was still indication of degenerative changes in her back, particularly the "facets," joints behind the vertebrae and discs. *Id.* at 21 and 23. When again asked whether there was any connection between that diagnosis and the fall that occurred in November 2004, he replied: "Not in my opinion." *Id.* at 23. When Dr. Green was asked whether there is any objective finding that you see during this course of treatment over the last three years that objectively pinpoints an injury or objectively quantifies the reasons for her pain, he responded: "No." *Id.* at 24. Dr. Green was asked: "And is it your opinion today that Ms. Cherry objectively suffered an injury on November 29, 2004?" and Dr. Green responded: "There is not evidence for that." *Id.* at 25.

Finally, Dr. Green was asked: "Was that diminishment of her physical condition spurred on – spurred by an alleged fall of November 19, 2004, or is that something that's just kind of been going on and on and kind of a natural cycle?" Dr. Green responded:

> The degenerative process that has been identified is the result of all of the stresses she has put on her back during her lifetime. At times a trauma can change that and accelerate it. The only way we know if a particular event made a difference is if it causes enough specific symptoms that we can say this is what changed. In her case there isn't anything like that evident. Any type of fall or lifting or whatever that she did ultimately contributed infinitesimally to the progression, but nothing significant changed in November of '04.

(Green Dep., *Id.* at 30-31.)

The Court finds and determines that plaintiff has failed to carry her factual

Findings and Conclusions          6

burden of proof that any claimed injuries or damages relevant to this action were caused by the incident of November 29, 2004 described earlier herein.

The Court finds and determines that under the applicable legal standard, plaintiff has failed to carry her factual burden of proof as to any claims of negligence or unseaworthiness.

No negligence on the part of the United States, or its agents or employees, caused, or contributed in any manner to, plaintiff's alleged injury or claimed damages.

No unseaworthiness of the vessel caused, or contributed in any manner to, plaintiff's alleged injury or claimed damages.

## **CONCLUSIONS OF LAW**

Plaintiff's claim alleges facts that constitute an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  With respect to subject matter jurisdiction over the United States, the United States of America has waived its sovereign immunity from suit and consented to be sued herein, if at all, solely pursuant to the provisions of the Public Vessels Act (PVA), recodified at 46 U.S.C. § 31101, *et seq*. (previously §§ 781-790), which incorporates the consistent provisions of the Suits in Admiralty Act (SIAA), recodified at 46 U.S.C. § 30901, *et seq*. (previously §§ 741-752).

Under the Public Vessels Act, an injured party has no greater claim against the United States than one would have against a private person under similar circumstances. *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 227-8 (1945).

A district court has broad discretion in matters of trial management and scheduling. *Daniel J. Hartwing Associates, Inc. v. Kanner,* 913 F.2d 1213, 1222 (7th Cir. 1990).  The trial date scheduled in this case was established by the Court, with the consent and input of the parties' counsel, long before commencement of the trial.

The Court found that the issue of causation – under the facts of this case – calls for

Findings and Conclusions             7

expert medical testimony. *Strok v. F/T Northern Jager*, 1992 WL 503590 (W.D.Wash. 1992), 1993 A.M.C. 1290. Since plaintiff did not disclose her physician as an expert regarding causation issues pursuant to the provisions of Fed. R. Civ. P. 26(a)(2)(A), testimony by the witness concerning causation issues would have been improper, *see, Mansoor v. M/V Zaandam* 2006 WL 2222332 (W.D.Wash. 2006), as the Court so determined.

At the time of plaintiff's alleged injury she was employed by Crowley Liner Services as a "seaman" aboard the CAPE INTREPID. As such, plaintiff's negligence cause of action against the United States is based on the Jones Act, 46 U.S.C. § 688. In addition, she asserts that the vessel was unseaworthy, giving rise to liability under the general maritime law. However, if a plaintiff's actions are the sole and proximate cause of her injuries, there is no liability under either the Jones Act or the general maritime law. See, *e.g.*, *Thornton v. Deep Sea Dive Boats*, 399 F.Supp. 933, 936 (S.D. Ala. 1975):

> Although in maritime personal injuries the doctrine of comparative negligence governs, the shipowner cannot be held liable for damages where, as under the facts of this case, the plaintiff's injuries result solely from his own negligence.

See also, *Garcia v. Dover Shipping*, 380 F.Supp. 607 (E.D. Pa. 1974), *affirmed*, 511 F.2d 1392-93 (3rd Cir. 1975); *Gavagan v. United States*, 955 F.2d 1016, 1022 (5th Cir. 1992): *Dickens v. United States (SS CAPE FAREWELL)*, 815 F.Supp. 913 (E.D. Va. 1993); 380 F.Supp. 607 (E.D. Pa. 1974), *affirmed*, 511 F.2d 1392-93 (3rd Cir. 1975).

Wholly aside from the issues pertaining to plaintiff's sole negligence, the foregoing conclusion of law is in accord with the general maritime law and the Jones Act, 46 U.S.C. § 688. The latter incorporates the standard of liability enunciated in the Federal Employers' Liability Act, 45 U.S.C. § 51 (FELA). Although the Jones Act is remedial legislation, it not a workers' compensation statute. *Lamon v. Standard Oil Co.*, 117 F.Supp. 831, 834 (D. La. 1954). Plaintiff is required to prove her employer was negligent and that this negligence was a cause of her injuries. *Matter of Heckinger*, 890 F.2d 202 (9th Cir.

Findings and Conclusions          8

1989), *cert. den.*, 498 U.S. 848 (1990). In this regard, a plaintiff must meet the standard for proving negligence required of all tort plaintiffs, not some mythical featherweight burden, a term which has been loosely and improperly employed in the past. See, *e.g.*, *Gautreaux v. Scrulock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (*en banc*). See also, 1 Schoenbaum, *Admiralty and Maritime Law* § 6-22 at 319-321 (Practitioner's Treatise Series 1994).

The Court finds that plaintiff has not established, through credible medical testimony, that her alleged injuries were caused by any negligence on the part of the United States.

The mere fact that an injury has been sustained while a plaintiff is employed in the service of a ship does not, standing alone, establish unseaworthiness liability on the part of the shipowner, *Mosely v. Cia Mar. Adra, S.A.*, 314 F.2d 223 (2nd Cir. 1963), *cert. denied*, 375 U.S. 829, 375 U.S. 835 (1963), nor is a ship the insurer of a seaman's safety. *Phipps v. N.V. Nederlandsche Amerikaansche S.M.*, 259 F.2d 143 (9th Cir. 1958). A shipowner is not required to furnish a seaman with an accident-free ship. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926 (1960); *Reinhart v. United States*, 457 F.2d 151 (9th Cir. 1972).

The shipowner is not obligated to provide a perfect, accident-free vessel; its duty to a seaman is limited to furnishing a vessel and appurtenances thereto which are reasonably fit for their intended use. See, *Mitchell v. Trawler Racer, Inc.*, *supra.*, at 550; *Colon v. Trinidad Corporation*, 188 F.Supp. 97, 100 (S.D. N.Y. 1960). See *Bilger v. Maritime Overseas Corporation*, 304 F.Supp. 1024 (N.D. Ca. 1969), *aff'd*, 439 F.2d 707 (9th Cir. 1971).

The burden of proving the unseaworthiness of a vessel or the negligence of a shipowner rests entirely and absolutely on the seaman plaintiff. *Ramos v. Matson Navigation Company*, 316 F.2d 128 (9th Cir. 1963); *Lieberman v. Matson Navigation Co.*, 300 F.2d 661 (9th Cir. 1962); *Fueston v. Lykes Brothers S.S. Co.*, 550 F. Supp. 139 (N.D. Cal. 1982), *aff'd*, 714 F.2d 152 (9th Cir. 1983); *Thomas v. Diamond M. Drilling Co.*, 569

F.2d 926 (5th Cir. 1978). Significantly, the seaman plaintiff must prove that the unseaworthiness and/or negligence was a proximate cause of her injuries. *Matter of Hechinger, supra*; *Ramos v. Matson, supra; Moore v. United States*, 347 F.Supp. 38 (N.D. Cal. 1972); *Martinez v. Sea-Land Service, Inc.*, 637 F.Supp. 503 (D. P.R. 1986); *Harris v. Amer. Export Lines*, 1980 A.M.C. 2652 (E.D. Pa. 1978) [not otherwise reported].

Plaintiff has failed to establish that her alleged injuries were caused by any unseaworthy condition of the vessel. Because plaintiff has failed to establish that her alleged injuries were caused by an unseaworthy condition of the CAPE INTREPID, plaintiff's claims of unseaworthiness shall be, and the same are, dismissed and judgment shall be entered in favor of the United States as to all such claims and causes of action.

Plaintiff has failed to establish that her alleged injuries were caused by the negligence of the United States. Because Plaintiff has failed to establish that her alleged injuries were caused by negligence of the United States, Plaintiff's claims of negligence under the Jones Act shall be, and the same are, dismissed and judgment shall be entered in favor of the United States as to all such claims and causes of action.

Any Findings of Fact which constitute Conclusions of Law and Conclusions of Law which constitute Findings of Fact shall be deemed to have been determined accordingly.

DATED this 25th day of October 2007.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

Findings and Conclusions          10